Tango v. Willis, No. 1501-03 Cncv (Katz, J., Oct. 15, 2004)


[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


STATE OF VERMONT                                       SUPERIOR COURT
Chittenden County, ss.:                              Docket No. 1501-03 CnCiv


TANGO PROPERTIES

v.

WILLIS and STEELE


FINDINGS OF FACT
CONCLUSIONS OF LAW
AND NOTICE OF DECISION


    This matter was tried to the court on September 22, 2004. On the basis of the evidence presented, the following decision is announced.

FINDINGS OF FACT


1

1.     Landlord Tango rented to tenants Willis and Steele the second floor apartment at 16–18 Johnson Street, an old building in Burlington's Old North End.  They executed a written lease effective May 1, 2003, expiring April 30, 2004.  Monthly rent was $1140.

2.     Although the printed form lease provided for the landlord to supply "gas," which we understand was meant to denote heat, the parties altered the form to say "landlord will have individual meters set up by 9/1/03. . . ."  It was undisputed that the meaning of this alteration was that the landlord would substitute modern gas heaters inside the apartment unit, and disconnect the old steam boiler in the basement, which served both apartments.  The effect of this change was clearly understood to mean that tenants would thereafter have to pay for the gas to heat their apartment.

3.     Landlord did install the new heating appliance. Tenants complain that it did not uniformly heat the entire apartment.  Instead, they testified that it would be 80–85° in the kitchen while only 60–65° in the "front rooms" or bathroom.  It appears uncontested that Burlington's code enforcement official inspected the apartment with the specific purpose in mind of checking out the heat source, last December, and did not find any reason to criticize the landlord for the new equipment.  We also find that tenants were not careful about closing the storm windows during the winter.  We decline to find that the heating appliance was inadequate, according to the requirements of Burlington's code.  Although the inspector testified that he still wished to be delivered some sort of specification sheet regarding the appliance, we cannot find that the failure to deliver a spec sheet actually caused harm or otherwise indicates some sort of inadequacy.

4.     The lease amendment also notes "hot water for laundry to be provided by landlord."  Apparently after this lease was made between the

2

parties, the City determined that the washer and dryer located in the basement for tenant use was improperly installed. As a result, landlord had them removed. Despite the provision about hot water for laundry, there is no explicit requirement that the appliances be provided, and there was further no proof regarding loss for lack of a washer and dryer or for failure to deliver hot water.

5.      There was a separate hot water issue, in that the installation of new gas heaters was accompanied by substantial re-piping of the gas supply by the Gas Company. This resulted first in this apartment's hot water being turned off, and then the discovery that the hot water supplies for the two apartments were switched. This was all the doing of the Gas Company. The landlord was not negligent in relying on that company. All problems were very quickly rectified. No proven damages.

6.      The interior of the apartment was habitable during the period of this tenancy. There were minor problems but none that rendered it unfit for human habitation.

7.      The front and rear porches had code deficiencies, as did the stairway up to the rear porch. The landlord made some efforts to repair them, which were at times amateurish. For example: installing pressure treated floor boards without affixing them to the porch joists and then affixing them with one row of screws going down the middle, instead of a row on each side. The landlord was also slow to repair the stairs. However, we are persuaded that the landlord's efforts to repair the stairs were effectively stymied by the tenants, who refused access to their apartment. Landlord would call up and leave an answering machine message "I will have to have access to your apartment in two days." He would arrive to find a sign posted on the front door denying access,

"Trespassers will be prosecuted!! This includes entry for repairs, Pike!" (Punctuation in original).

8.     Another front door sign also read "No Notice from Lawyer = NO ENTRY." This apparently carried out a unilateral decision by the tenants to refuse to communicate directly with the landlord on such issues as access for repairs, insisting instead that all communications go through their respective lawyers. Such a position has the effect of increasing the cost for the landlord.

9.     Tenants moved on May 1. They were delinquent in the payment of rent several times, and stopped paying it in October. This action was commenced December 3, 2003. A stipulated rent escrow order was entered January 23, 2004, and rent was paid to the clerk of court from that time until the tenants vacated the apartment. Hence, from October 1 through January 23, no rent was paid. At $1,140 per month, three full months equals $3,420. The first 23 days of January equal $845. Thus, $4,265 was not paid in rent.

10.     When the parties agreed to a rent escrow of $900, that was a temporary compromise regarding the rent escrow order. There is nothing to indicate that it constituted a binding stipulation as to fair rent, or fair rent in the face of some code violations. As this reduction resulted in a $240 per month savings to the tenant, over the rent provided in the lease, it constituted five months' savings of $1,200, plus an additional $80 for the balance of January, or $1,280 in total.

11.     When this lease was coming toward its end, communications had broken down between the parties. Although this may have been somewhat more the fault of tenants, who were constructing artificial barriers by only

4

recognizing communications through the attorneys, we are not prepared to conclude that any result from the breakdown was their fault. Nevertheless, at the end of the written lease period, the landlord did not know if the tenants would be vacating, but he assumed that they would be. He assumed this although they were contesting this eviction case in court and had been paying the rent escrow in a roughly timely manner. Assuming that the tenants were leaving at the end of April, he made a new lease to re-let the apartment starting May 1. As we now know, these tenants did not leave May 1, so the new tenants could not move it. Feeling bound by the obligations of his new lease, landlord put up the new tenants in a hotel for a few days, reimbursed them for their eating out, and then reached a financial settlement with them when they had to lease other premises at a higher cost. He seeks recovery of these costs, and he proved their amounts.

12. We are not persuaded that tenants' work to improve the apartment or its stairway were substantial, such that they should receive a credit for that work. There was no proof of any agreement with the landlord for such a credit. When tenants paint the living room floor mauve, without permission, there is no basis for concluding that such an alteration will be of any value to the landlord in renting to the next tenants.

13. Tenant Steele apparently tripped on the cellar stairs, carrying her empty laundry basket down to retrieve a load of laundered clothes. She testified to have sprained her ankle, missed a day of work, and suffered pain as a result. There was no proof that these interior cellar stairs did not comply with City code. We are not persuaded that the landlord's maintenance of those stairs was somehow negligent. We make no award on this account.

14. When they finally vacated, tenants left behind junk that had to be

5

removed and a number of messes that had to be cleaned up. We are persuaded the following items were caused by these tenants, and the amounts claimed are reasonable:

| | | |
|---|---|---|
| Cleaning | $ | 240 |
| Repaint bedroom wall | | 70 |
| Replace broken lock | 67 | |
| Refinish floor painted mauve | | 990 |
| Misc repairs and hardware replacement | | 110 |
| Total | $ | 1,477 |

15. Tenants did not pay July rent into the court, did not actually leave the apartment by July 1, left items behind when they did vacate July 4, and did not tell landlord that they had no interest in retrieving those items, under circumstances in which the law bars the landlord from just throwing it out. Tenants should therefore have to pay for July rent. They also are entitled to a credit for their security deposit. These items are a wash.

CONCLUSIONS OF LAW

A. Tenants cannot complain of repairs not made, when they denied landlord access to make those repairs. See Hilder v. St. Peter, 144 Vt. 150, 158–59 (1984) (modern leases expect landlord to maintain premises and come onto property to make repairs).

B. No party to a contract has the unilateral right to increase the transaction costs of another, as by insisting that all communications go through the lawyers. Such an edict violates the implicit duty of good faith and fair dealing. Carmichael v. Adirondack Bottled Gas Corp., 161 Vt. 200, 208 (1993). The duty of good faith is "to ensure that parties to a contract act with 'faithfulness to an agreed common

6

purpose and consistency with the justified expectations of the other party.'" Id. (quoting from the Restatement (Second) of Contracts § 205 cmt. a (1981). Although this landlord may not always have been timely and may have committed some errors, such as leaving a door open, such that the cat exited, he did not abuse these tenants in any way suggesting that they were justified in refusing to communicate with him except through the attorneys. Cf. Hilder, 144 Vt. at 154–57 (landlord completely ignored tenants repeated requests to repair basic services).

C.  Failure of the dwelling to comply with an applicable code may constitute an affirmative defense to the obligation to pay rent. Id. at 160–61. As such, it is the tenant's duty to prove the facts necessary to support a conclusion of such noncompliance. Id. When tenants raise the issue of the space heater not being able to heat one or another room, that raises a fact question, on which they bear the burden of persuasion. When, in turn, the housing inspector testifies that he inspected it, was "concerned" about its ability to heat all the rooms, and that he never received a specification sheet from the landlord, despite a request therefore, that is actually insufficient proof. The warranty of habitability, which is all we enforce here, does not require the production of specification sheets. It remains the tenants' burden to persuade the factfinder that the heater, in this instance, was insufficient to satisfy code requirements.

D.  There clearly was some degree of code noncompliance in the structure, although any significant noncompliance was in the outdoor porches and stairs. It is appropriate for the court to consider the extent to which rent should be reduced for such noncompliance. Given the facts that the noncompliance was external to the dwelling

7

unit and that tenants interfered with the landlord's efforts to repair, such as by barring him access to electric outlets for using a power saw, we consider that a $100 per month credit is fair against the rent. Although the lease rental of $1,140 may seem high for a second floor apartment in a somewhat rundown building, this is very close to Burlington's downtown, and the lease rental must be considered to be fair market price, excepting only code noncompliance. Doing the math, the tenants owe $4,265 in wholly unpaid rent, and $1,280 saved during the escrow period, totaling $5,555 owing in rent. Against this, they are entitled to a credit of $1,200 for noncompliance of the stairs and porches, at least for some period of their tenancy. That leaves a net balance of $4,355.

E.     When one party breaches a lease, as in a breach of any contract, the other has the duty to mitigate its damages. O'Brien v. Black, 162 Vt. 448, 453 (1994). Here, it would appear that tenants did, in fact, breach the lease, as it provides for no holding over. See Lease ¶ 1 ("Tenant may not remain in possession of the leased premises beyond dusk 4/30/2004. Tenancy ends with the expiration of this lease.") But in assuming that these tenants would honor their contract and leave, and undertaking new lease obligations on the basis of this assumption, did landlord assume too much? In view of the fact that his undertakings, and resulting damages, far exceed the monthly rental value of the premises, we think he did, and thereby failed to mitigate his damages. Had landlord done nothing, at the end of the lease term, he would have faced one of two alternatives: Either the tenants, as in fact occurred, stayed in the apartment and continued paying the rent into the court's escrow account, or they did not pay their required monthly escrow amount. In the first event, the landlord would have suffered no loss. In the second event,

8

landlord would have been eligible to receive a partial judgment for possession within a few days, and would have effectively recovered possession before the month ran out. Hence, even in the second event, his damages would have been something less than a full month's rent. Such damages, of course, assume an unsatisfied judgment at the end of the process. But when, as here, landlord unilaterally undertook new obligations, and then had to pay out considerably more than twice the May monthly rent to satisfy those obligations, he failed to mitigate his damages. For these reasons, we decline to award the claimed damages.

## NOTICE OF DECISION

Plaintiff landlord entitled to recover back rent plus repairs, $4,355 plus $1,477. Landlord entitled to payment of amounts held in escrow by the clerk of court. Landlord entitled to costs and reasonable attorneys fees. Landlord shall submit a proposed form of judgment.

Dated at Burlington, Vermont, _____, 2004.

_____
Judge

_____
Assistant Judge